UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 OCT 24  PM 5: 04

CLERK

BY _____
      DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 5:13-cr-24 |
| | ) | |
| VALENTINO ANDERSON | ) | |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO JOIN IN CRYSTAL ANDERSON'S MOTION TO SUPPRESS AND ORDERING PHYSICAL EVIDENCE SUPPRESSED
(Doc. 30)

This matter came before the court on August 14, 2013 for an evidentiary hearing on Defendant Valentino Anderson's motion to join his wife and co-conspirator Crystal Hall Anderson's motion to suppress evidence and statements.

Defendant is charged in a three-count Indictment with one count of conspiring with Crystal Hall Anderson to distribute heroin and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846; one count of possession of cocaine base with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 18 U.S.C. § 2; and one count of distribution of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

Following her indictment in a parallel case, Crystal Anderson sought to suppress all evidence stemming from her arrest, arguing that there was no probable cause for her arrest and that the evidence removed from her vaginal cavity was not voluntarily obtained. She also sought to suppress her post-arrest statements, contending that she was subjected to custodial interrogation without the benefit of *Miranda* warnings and that after she was belatedly provided *Miranda* warnings, law enforcement did not honor her invocation of her right to remain silent or obtain a knowing and voluntary waiver of her rights. Ms. Anderson's motion was rendered moot when the government entered into a Fed. R. Crim. P. 11(c)(1)(C) plea agreement with her which called for a sentence of time served. The parties asked to waive the presentence report and to proceed immediately to

sentencing.  The court granted these requests, accepted the plea agreement, and sentenced Ms. Anderson to time served, with supervised release to follow.

Defendant asserts that "he has standing to demand the relief sought in Crystal Anderson's Motion to Suppress, since, if offered and admitted against him at trial, the evidence seized from Ms. Anderson in the course of a bad faith search would constitute a violation of [Defendant's Fifth] Amendment due process rights."  (Doc. 30 at 1.)  The government opposes Defendant's motion, arguing that Defendant lacks standing to seek suppression of evidence arguably obtained in violation of Ms. Anderson's "personal rights" under the Fourth and Fifth Amendments.  (Doc. 41 at 3.)

In rulings made on the record at the court's August 14 evidentiary hearing, the court concluded that Defendant does not have standing to challenge evidence obtained from Ms. Anderson in violation of her Fourth Amendment rights[1] or standing to seek suppression of statements she made in violation of her *Miranda* rights under the Fifth Amendment.[2]  Accordingly, the court denied Defendant's motion to join in Ms. Anderson's motion to suppress on those grounds.  However, the court took under advisement the remaining issue raised in Defendant's motion: whether admitting evidence recovered from Ms. Anderson's body would violate Defendant's own substantive due process rights because the evidence was obtained by "conduct that shocks the conscience."  *Rochin v. California*, 342 U.S. 165, 172 (1952).

The government is represented by Assistant United States Attorney Craig S. Nolan.  Defendant is represented by Richard C. Bothfeld, Esq.

---

[1] The Supreme Court has held that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.  Coconspirators and codefendants have been accorded no special standing."  *Alderman v. United States*, 394 U.S. 165, 171-72 (1969).

[2] In *United States v. Ballentine*, 410 F.2d 375 (2d Cir. 1969), the Second Circuit held that a defendant does not have standing to challenge a codefendant's statements based on an alleged *Miranda* violation.  *Id.* at 377 n.2; *see also Bellis v. United States*, 417 U.S. 85, 90 (1974) (holding that "the Fifth Amendment privilege is a purely personal one").

I.      **Findings of Fact.**

The following findings of fact are derived from the affidavit of Vermont State Police ("VSP") Senior Trooper Michael Studin and the Investigation Narrative authored by VSP Senior Trooper Max Trenosky, as well as three videotapes depicting portions of Ms. Anderson's detainment at VSP's Brattleboro barracks. Where the affidavits differ from the events reflected in the videotapes, the court has relied on the videotapes. *See Scott v. Harris*, 550 U.S. 372, 378-81 (2007) (ruling that when there is "a videotape capturing the events in question," a court should rely on the facts "depicted by the videotape").

At approximately 9:00 p.m. on October 30, 2012, Trooper Studin received a call from Massachusetts State Trooper Brandon Shurgue reporting a "suspicious vehicle" identified as a gray 2005 Pontiac Grand Am with Vermont license plate FRB811 traveling north on Interstate 91 in the City of Springfield, Massachusetts. (Doc. 29-1 at 1.) Trooper Shurgue advised Trooper Studin that he had checked the vehicle's registration and discovered that the registered owner had numerous prior arrests, including for the sale of cocaine and a firearm violation from New York City. Trooper Studin, in turn, contacted Trooper Trenosky to advise him "of a potential drug load coming up Interstate 91," and Trooper Trenosky stationed himself on Interstate 91 near the Vermont/Massachusetts border. (Doc. 29-2 at 1.)

Approximately forty-five minutes later, Trooper Studin located the suspect vehicle traveling north on Interstate 91, through Brattleboro, Vermont. He observed that both the front passenger's and driver's windows were rolled down even though it was raining outside. The vehicle exited the interstate and pulled into a gas station. As the vehicle left the gas station a few minutes later, Trooper Studin determined that the vehicle's front headlights were not illuminated in violation of 23 V.S.A. § 1244, and he conducted a traffic stop of the vehicle. Trooper Trenosky arrived at the traffic stop shortly thereafter.

Defendant was the operator of the vehicle. His passengers were Kenneth Clark, seated in the front passenger's seat, and Crystal Anderson, seated in the back seat directly

behind Defendant.  Defendant told Trooper Studin that they had driven from Rutland, Vermont, to Rhode Island to visit Mr. Clark's grandson, who lives in Westerly, Rhode Island.  In the course of their conversations with the troopers, the three occupants offered differing accounts regarding the purpose of their trip, whom they visited, and the trip's duration.

After Trooper Studin advised Defendant that he would be issuing a written warning for the headlight infraction, Defendant agreed to exit the vehicle and permit a search of his person.  During a search of Defendant's person, Trooper Studin located a receipt from a restaurant in Hartford, Connecticut, dated 10/30/12 at 6:43 p.m.  When he asked Defendant if they had traveled through Connecticut, Defendant stated they had not.  Defendant ultimately admitted that they had traveled to Hartford that day.  Defendant further reported to Trooper Studin that he "previously" had used heroin and that his wife, Ms. Anderson, had "problems with heroin and crack cocaine."  (Doc. 29-1 at 2.)

While Trooper Studin searched and interviewed Defendant, Trooper Trenosky spoke with Mr. Clark and Ms. Anderson, both of whom told him that they had traveled to Westerly, Rhode Island, that day and had not been to Hartford, Connecticut.  During his interactions with Mr. Clark and Ms. Anderson, Trooper Trenosky observed that the two acted nervous and repeatedly smoked cigarettes, and he "observed [Ms.] Anderson's lower abdomen move rapidly."  (Doc. 29-2 at 1.)  Trooper Trenosky then asked for and obtained permission to search both Mr. Clark and Ms. Anderson.  He found no contraband on either, but he noted that Ms. Anderson was "shaking" during the search.  *Id.*  When asked, Ms. Anderson advised Trooper Trenosky that she had "done a lot of drugs within the last two years," including cocaine.  *Id.* at 2.

Thereafter, Trooper Studin sought and obtained Defendant's consent to search the vehicle.  He found in Ms. Anderson's purse a plastic Ziploc bag that contained numerous small round white pills, several razor blades, two condoms, and a bottle of hand sanitizer.  Trooper Studin then searched the compartment on the back of the front passenger seat, in front of where Ms. Anderson had been sitting.  He located a small brown handbag that had several documents bearing Ms. Anderson's name.  In the handbag, Trooper Studin

4

found two used syringes and a metal spoon with "a cotton ball on the concave portion and burn marks on the convex portion," which he "recognized [as] items commonly used by intravenous drug users." (Doc. 29-1 at 3.) He also found "a glass tube" that he recognized as a "crack pipe." *Id.*

During the search of the vehicle, Trooper Studin found in the pocket of a jacket, which Defendant stated belonged to him, a plastic sandwich bag containing a white powdery substance that Trooper Studin suspected was powder cocaine. Defendant admitted that it was the remainder of the cocaine that he had consumed two days earlier.

Trooper Studin seized the items that appeared to him to be drugs or drug paraphernalia. He then placed Ms. Anderson in handcuffs, advising her that "she was being detained for investigatory purposes." (Doc. 29-1 at 3.) Ms. Anderson was placed in the front passenger seat of Trooper Trenosky's vehicle, and Trooper Trenosky remained with her. During this time, he observed that Ms. Anderson moved around a lot and that she kept asking him to check on her husband, which Trooper Trenosky surmised "was a tactic to get [him] away from [the] vehicle as she either shoved the 'product' deeper into her pants or attempt[ed] to leave it in [the] vehicle." (Doc. 29-2 at 2.)

Another VSP trooper, Senior Trooper Kevin Hughes, arrived at the traffic stop with his canine. During an exterior search of Defendant's vehicle for the presence of narcotics, the canine alerted. Trooper Hughes and the canine then performed an interior search of the front passenger seat of Trooper Trenosky's vehicle, where Ms. Anderson had been seated, and the canine "alerted to the seat for the presence of the odor of illegal narcotics." (Doc. 29-1 at 3.)

Trooper Studin released Defendant and Mr. Clark and allowed them to continue on their way. He, however, detained Ms. Anderson without advising her she was under arrest. He told her they were transporting her to VSP's Brattleboro barracks and that he would attempt to obtain a search warrant for her person. At the VSP barracks, Ms. Anderson advised that she knew her rights and that law enforcement did not have any reason to get a search warrant. Trooper Trenosky, accompanied by two unidentified law enforcement officers, escorted Ms. Anderson to a processing room within the barracks to

5

await the search warrant.  In the processing room, Trooper Trenosky directed Ms. Anderson to sit in a chair, handcuffed her arm to the chair, and left the room.

At the VSP barracks, Trooper Studin contacted the Windham County State's Attorney and applied for a state search warrant to search Ms. Anderson's body cavity. The state court judge denied the search warrant.  Both Trooper Studin and Trooper Trenosky were informed that the search warrant application had been denied.

After approximately forty minutes during which Ms. Anderson waited alone in the processing room handcuffed to the chair, VSP Officer Aubrey Crowley entered the room, identified herself, and asked if Ms. Anderson needed water.  When Ms. Anderson indicated that she would like water, Officer Crowley left and returned with a large glass of water.  Officer Crowley asked if Ms. Anderson was "doing ok" and "alright for now," and she advised Ms. Anderson to ask her if she needed anything.  Ms. Anderson made no comments or requests, and Officer Crowley left the room.  Approximately fifty minutes thereafter, Officer Crowley briefly returned to the room to ask "how ya doing" and are you "ok," to which Ms. Anderson replied, "uh-huh."  Officer Crowley left, and Ms. Anderson, who remained handcuffed, appeared slumped in the chair, attempting to sleep.

When Ms. Anderson had been detained for approximately three hours in the processing room, Officer Crowley once again returned to the room to ask if Ms. Anderson needed more water, which Ms. Anderson declined.  Officer Crowley then told Ms. Anderson, "just so you know, he's going to go see the judge right now and get that all signed off, alright?"  Ms. Anderson did not reply.  Presumably, Officer Crowley knew at the time that the warrant application had been denied and that her statement to Ms. Anderson was false.

Approximately thirty minutes thereafter, Officer Crowley returned to the processing room, telling Ms. Anderson she wanted to "chat."  Officer Crowley provided water to Ms. Anderson, who remained seated.  Officer Crowley moved another chair close to the chair on which Ms. Anderson sat, and she sat between Ms. Anderson and the door.  Officer Crowley initiated the conversation, stating "so we're going to be headed over to the hospital, okay?"  She asked if there was anything Ms. Anderson wanted to

6

talk about or share with her specifically because she was "a girl" and because the other officers could be "a little brusque" and "hard to talk to." Ms. Anderson repeatedly asked to see the warrant, and Officer Crowley continued to reiterate her request that Ms. Anderson speak with her. Ms. Anderson stated that she might talk if she saw a warrant and questioned why they would not show her the warrant if they were going to the hospital. Officer Crowley did not respond to Ms. Anderson's request to see the warrant and did not tell her it did not exist. She left the room after acknowledging that Ms. Anderson did not want to talk to her. At this juncture, Ms. Anderson had been detained in the room for over three-and-a-half hours. She appeared disheveled, groggy and uncommunicative, hanging her head or turning away as Officer Crowley attempted to engage her in conversation.

After approximately four hours of detention,[3] Officer Crowley came back to the processing room and told Ms. Anderson, "let's go," and "we're getting ready to go." Ms. Anderson replied, "like I said, you show me the warrant and there's no point." Officer Crowley handcuffed both of Ms. Anderson's hands and escorted her from the processing room to a conference room in the barracks. She did not advise Ms. Anderson that the search warrant application had been denied, but rather appeared to be preparing to transport Ms. Anderson to a local hospital.

At some time later, in the early morning hours of October 31, Trooper Trenosky joined Officer Crowley and Ms. Anderson in the conference room. Trooper Trenosky removed Ms. Anderson's handcuffs. He then "made small talk by bringing up the fact that her husband had a poor relationship with her as he threw her 'under the bus' roadside" and "that it speaks volumes about his character, how he left her and went back to Rutland." (Doc. 29-2 at 2.) Trooper Studin reported that Trooper Trenosky "advised her that he was disappointed" with her and that her relationship with her husband "must not be that good if he was willing to let her take responsibility for trafficking his drugs." (Doc. 29-1 at 3.)

---

[3] This assumes that there is no time lapse between the end of the first videotape and the beginning of the second videotape.

At some point during Trooper Trenosky's conversation with Ms. Anderson, Officer Crowley brought the search warrant application in to the conference room. Ms. Anderson examined the warrant application, asking where the judge's signature was and stating that if she saw a signed copy she might talk. Trooper Trenosky did not answer her questions but "reiterated how poorly her husband treated her." (Doc. 29-2 at 2.) Ms. Anderson then began to whimper and cry, stating something to the effect that she was not going to go to jail for twenty years for him. After eliciting this admission, Trooper Trenosky asked Ms. Anderson if she had been advised of her *Miranda* rights, and she replied that she had not. Trooper Trenosky read Ms. Anderson *Miranda* warnings from a form and asked if she would speak with him. She signed the waiver form at 4:22 a.m. on the morning on October 31, approximately six hours after the initial motor vehicle stop. Ms. Anderson was then escorted back to the processing room where she had been held originally. She was not handcuffed as she entered the room, and she was not handcuffed for the remainder of the interview with Trooper Trenosky, which occurred over the course of approximately two hours and included at times another unidentified VSP officer.

During the interview, Trooper Trenosky sat a few feet from Ms. Anderson and between her and the door. Trooper Trenosky began by asking her where the drugs were, and Ms. Anderson admitted that the drugs were inside her. Thereafter, Trooper Trenosky questioned Ms. Anderson further, repeatedly stating that, while he could not understand personally, she must be very uncomfortable. He told Ms. Anderson that the "easiest way to do this" would be for her to remove the drugs in the presence of the female officer.[4]

---

[4] Trooper Trenosky's Investigation Narrative states: "I informed her that she still had two options one being the voluntary way which would mean that she would pull the narcotics out of her cavity or continue with the warrant process." (Doc. 29-2 at 2.) This statement is inaccurate because while Trooper Trenosky initially advised Ms. Anderson that there were a "couple of options that we have," the only option he explained to her at that point in time was that she "could take that out of her body, and . . . do it in front of the female police officer that's here, and that's the easiest way to do this." Before escorting Ms. Anderson from the processing room to the bathroom, Trooper Trenosky told Ms. Anderson that, "with the body warrant, it's very difficult for us to actually get it signed a lot of times, so a lot of times we ask for voluntary consent;" however, he did not advise her that the warrant had been denied, but rather told Ms.

He also asked if the drugs were "in the front or the back," explaining that was the "only way" he could "politely word it." She admitted the drugs were in her vagina. Trooper Trenosky then asked if she wanted to take the drugs out, and Ms. Anderson answered "yes." He then left the room to advise Trooper Studin that Ms. Anderson had admitted to carrying drugs and to find Officer Crowley to accompany Ms. Anderson to the bathroom.

Trooper Trenosky then escorted Ms. Anderson out of the processing room. Approximately three minutes later,[5] Ms. Anderson and Trooper Trenosky returned to the processing room, with Trooper Trenosky carrying in a plastic evidence bag "a tan colored condom" that Officer Crowley advised Ms. Anderson had removed from her vagina. (Doc. 29-1 at 4.)  Once back in the processing room, Trooper Trenosky asked Ms. Anderson the price her husband had paid for the drugs. He left and then returned briefly to elicit her admission that she was carrying crack cocaine. Ms. Anderson continued to sit, without handcuffs, but with her head down and resting on her right fist.

Trooper Trenosky then returned to give an "update." He asked her whether she thought the officers treated her "professionally" and "fairly," and she replied in the affirmative. He then told Ms. Anderson for the first time that the judge "did not agree with them" and had denied the search warrant. At the time, more than six hours had passed since Ms. Anderson was detained for "investigatory purposes" to await the search warrant.

Trooper Studin, with the help of another VSP trooper, examined the contents of the condom and found eight small plastic bags, tied with a knot and weighing 3.5 grams each and in aggregate approximately 27.7 grams. A sample tested positive for the presence of cocaine. The government seeks to admit the physical evidence recovered from Ms. Anderson in its case-in-chief against Defendant.

---

Anderson that she "made it a lot easier for us because [she] made an admission" and that "this is just one of those things."

[5] During this time, there is no one in the processing room. The videotape, however, recorded Trooper Trenosky speaking with another officer and advising the other officer that Ms. Anderson "broke down" after he confronted her about her husband and that he read her *Miranda* warnings thereafter.

## II.     Conclusions of Law and Analysis.

Defendant challenges the admission of the physical evidence obtained from his wife, Ms. Anderson, on the basis that the law enforcement's conduct in gathering this evidence "shocks the conscience," the standard articulated by the Supreme Court in *Rochin.* The government contends that Defendant cannot raise a substantive due process claim, that *Rochin* is of limited import, and that, even if the court applied *Rochin* to the facts of this case, the conduct here does not violate substantive due process and the evidence should not be suppressed.

### A.     Whether Defendant Can Assert a Substantive Due Process Claim to Challenge Admission of the Drugs Obtained from Ms. Anderson.

As the court previously found, Defendant does not have standing under the Fourth Amendment to seek suppression of evidence obtained from Ms. Anderson's person. *See United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008) ("A defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a 'legitimate expectation of privacy' in the place searched.") (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).  However, Defendant is not required to seek suppression of the physical evidence on Fourth Amendment principles alone.  The Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386 (1989), requires a defendant to base a constitutional argument on the Fourth Amendment, rather than on "the more generalized notion of 'substantive due process,'" only when "the Fourth Amendment provides an explicit textual source of constitutional protection." *Id.* at 395; *see also Albright v. Oliver*, 510 U.S. 266, 273-75 (1994) (affirming the *Graham* rule and determining substantive due process afforded defendant "no relief" when defendant could have raised a Fourth Amendment claim).  When a defendant's claim is not "'covered by' the Fourth Amendment," as is the case here, the defendant may proceed with a substantive due process claim. *See County of Sacramento v. Lewis*, 523 U.S. 833, 842-43 (1998) (concluding claim based on "facts involving a police chase aimed at apprehending suspects" was not covered by the Fourth Amendment and so the facts of that case could "support a due process claim").

10

If the drugs extracted from Ms. Anderson's person are analogized to involuntary statements, they would be inadmissible against Defendant even if highly probative of his guilt.[6] As the *Rochin* Court observed: "To attempt . . . to distinguish what lawyers call 'real evidence' from verbal evidence is to ignore the reasons for excluding coerced confessions.  Use of involuntary verbal confessions . . . is constitutionally obnoxious not only because of their unreliability," but also because they "offend the community's sense of fair play and decency." *Rochin*, 342 U.S. at 173.  Accordingly, under *Rochin*, Defendant has standing to challenge the admissibility of the physical evidence obtained from Ms. Anderson's body.

### B.    *Rochin* and Substantive Due Process.

In *Rochin*, the Supreme Court concluded that "the Due Process Clause inescapably imposes" on a court the requirement "to ascertain whether [the course of a proceeding against a criminal defendant would] offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *Rochin*, 342 U.S. at 169 (internal quotation marks

---

[6] *See United States v. Merkt*, 764 F.2d 266, 273-74 (5th Cir. 1985) ("[T]he admission at trial of a coerced out-of-court statement from a non-defendant may violate the defendant's right to a fair trial as guaranteed by the due process clause of the fifth amendment."); *see also United States v. Dowell*, 430 F.3d 1100, 1107 (10th Cir. 2005) ("It is clear that [defendant] does have standing to challenge the voluntariness of a witness's confession."); *Clanton v. Cooper*, 129 F.3d 1147, 1157-58 (10th Cir. 1997) ("[A] person may challenge the government's use against him or her of a coerced confession given by another person."); *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) ("Confessions wrung out of their makers may be less reliable than voluntary confessions, so that using one person's coerced confession at another's trial violates his rights under the due process clause."); *Wilcox v. Ford*, 813 F.2d 1140, 1148 (11th Cir. 1987) ("It is well settled that the admission of evidence which renders a trial fundamentally unfair warrants a new trial.  Even more to the point, the courts have held that the admission at trial of improperly obtained statements which results in a fundamentally unfair trial violates a defendant's Fifth Amendment right to a fair trial.") (internal citation omitted); *LaFrance v. Bohlinger*, 499 F.2d 29, 35 (1st Cir. 1974) (requiring district courts to determine voluntariness of a witness's statement if used against defendant at trial and if defendant raises credible claim statement "was obtained by police threats and other blatant forms of physical and mental duress"); *Bradford v. Johnson*, 476 F.2d 66 (6th Cir. 1973) (affirming trial court's decision that defendant had "constitutional ground" to seek suppression of another's coerced confession and concluding suppression of coerced confession necessary to "comport[] with a concept of fairness and civility, namely, due process of law") (internal citation omitted).

omitted).  While the Court recognized there was no specific formulation of these "standards of justice," it declared that "[d]ue process of law is a summarized constitutional guarantee of respect for those personal immunities which . . . are so rooted in the traditions and conscience of our people as to be ranked as fundamental, or are implicit in the concept of ordered liberty." *Id.* (citing *Palko v. Connecticut*, 302 U.S. 319, 325 (1937); *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934)).  Ultimately, the Court concluded that due process prohibits evidence obtained by "conduct that shocks the conscience." *Id.* at 172.

Since *Rochin*, the Supreme Court has clarified "that the Due Process Clause [of the Fifth Amendment] protects individuals against two types of government action," including, first, "[s]o-called 'substantive due process.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987).  In *Salerno*, the Supreme Court held that substantive due process incorporates the *Rochin* Court's "shocks the conscience" standard and thus substantive due process "prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty." *Id.* (internal citations and quotation marks omitted).

> To this end, for half a century now [the Supreme Court has] spoken of the cognizable level of executive abuse of power as that which shocks the conscience.  [The Court] first put the test this way in *Rochin*, where [the Court] found the forced pumping of a suspect's stomach enough to offend due process as conduct "that shocks the conscience" and violates the "decencies of civilized conduct."  In the intervening years [the Court has] repeatedly adhered to *Rochin*'s benchmark.

*Lewis*, 523 U.S. at 846-47 (internal citation omitted).  Accordingly, "in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right[] . . . to bodily integrity." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin*, 342 U.S. 165).

A recent decision from the Second Circuit confirms *Rochin*'s continuing viability. In *United States v. McLaurin*, 2013 WL 5477619 (2d Cir. Oct. 3, 2013), the Second Circuit concluded that a condition of supervised release that required the defendant to

submit to a penile plethysmograph examination was an "extraordinarily invasive condition," that included both a mental and physical intrusion into the defendant's body. *Id.* at *1, *3. It observed that:

> The condition of supervised release at issue is a sufficiently serious invasion of liberty such that it could be justified only if it is narrowly tailored to serve a compelling government interest. Because the Government has proffered no such justification, we agree with Judge Noonan of the Ninth Circuit that, even when dealing with convicted felons, "[t]here is a line at which the government must stop. Penile plethysmography testing crosses it."

*Id.* at *3 (quoting *United States v. Weber*, 451 F.3d 552, 571 (9th Cir. 2006) (Noonan, J., concurring)). Ultimately, after examining the government's justifications for it, the Second Circuit held that the condition of supervised release violated substantive due process. *Id* at *1, *6. In so ruling, the court observed that: "A person, even if convicted of a crime, retains his humanity. He also retains his right to substantive due process, even if it is sharply diminished in many respects." *Id* at *3.

In this case, there was no forced extraction of drugs from Ms. Anderson's vagina. Instead, the police officers repeatedly threatened that outcome under a ruse that a search warrant authorized them to transport Ms. Anderson to a local hospital where the suspected drugs would be removed from her body whether she cooperated or not. They persisted in this ruse until Ms. Anderson's will was overborne and she extracted the drugs herself at their direction after they commended her for opting for the "easiest way."

The Supreme Court has recognized that substantive due process may be violated by a "cognizable level of executive abuse of power." *Lewis*, 523 U.S. at 846. For a due process claim, "there is no meaningful distinction between physical and psychological harm." *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) (citing *United States v. Chin*, 934 F.2d 393, 399 n.4 (2d Cir. 1991)). While the Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," *Rochin* prohibits an abuse of police power that offends "the community's sense of fair play and decency." *Dowling v. United States*, 493 U.S. 342, 352-53 (1990). It is for this reason

that an involuntary confession, even if obtained by means of police coercion that is only psychological in nature, is inadmissible for any purpose. Indeed, the Supreme Court "mandate[s] the exclusion of reliable and probative evidence for *all* purposes . . . when it is derived from involuntary statements." *Michigan v. Harvey*, 494 U.S. 344, 351 (1990) (citing *New Jersey v. Portash*, 440 U.S. 450, 459 (1979) (holding compelled incriminating statements inadmissible for impeachment purposes)). As the Court explained in *Watkins v. Sowders*, 449 U.S. 341 (1981), "while an involuntary confession is inadmissible in part because such a confession is likely to be unreliable, it is also inadmissible even if it is true, because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." *Id.* at 347 (quoting *Jackson v. Denno*, 378 U.S. 368, 386 (1964)).

Accordingly, "'[t]he aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). *Rochin* and its progeny thus reveal the Court's continuing vigilance in ensuring that the "Due Process Clause imposes limitations on the government's ability to coerce individuals into participating in criminal prosecutions." *Doe v. United States*, 487 U.S. 201, 214 n.13 (1988).

## C.    Whether the Police Conduct Violates Substantive Due Process.

In order to find a violation of substantive due process, the court must consider the rights at stake, whether a violation of those rights offends human dignity and undermines fundamental fairness, whether a compelling government interest justified the infringement of rights and whether any intrusion was narrowly tailored to further that interest, and whether law enforcement engaged in deliberate misconduct in contravention to "precisely the qualities society has a right to expect from those entrusted" with power. *Rochin*, 342 U.S. at 172; *see also Glucksberg*, 521 U.S. at 720-21 (explaining the "features" of substantive due process are "that the Due Process Clause specially protects those fundamental rights and liberties . . . implicit in the concept of ordered liberty, such

14

that neither liberty nor justice would exist if they were sacrificed" and that the government cannot infringe thereon "unless the infringement is narrowly tailored to serve a compelling state interest") (internal citations and quotation marks omitted).

The court addresses the totality of the police conduct at issue here because it provides a context within which the court may evaluate whether there was an abuse of police power that offends "the community's sense of fair play and decency." *Dowling*, 493 U.S. at 353.

It is undisputed that Ms. Anderson experienced a lengthy incommunicado detention in a police barracks without a formal arrest and long after the reason for her "investigatory detention" had dissipated because a neutral and detached judge had informed law enforcement that they lacked probable cause to search her body for drugs. Ms. Anderson's continued detention after the warrant application was denied was, itself, unlawful. *See* W. LaFave, 4 Search & Seizure § 9.2(f) (5th ed. 2012) (explaining that when "there is no basis for further detention," the "suspect must be released").

While not inhumane, the circumstances of Ms. Anderson's detention were oppressive and coercive. She was handcuffed to a chair in the late night and early morning hours in a manner which made it difficult for her to sleep. She was left alone for prolonged periods of time with no access to the outside world. Although there is limited evidence of Ms. Anderson's physical, mental, or emotional state at the time, she appeared disheveled, disengaged, and groggy.

It is also beyond dispute that Ms. Anderson was subjected to custodial interrogation without the benefit of *Miranda* warnings. *See J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401-02 (2011) (explaining that the "inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements," and so "prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination" are required when "there has been such a restriction on a person's freedom as to render [the person] in custody") (internal citations and quotation marks omitted); *see also United States v. Newton*, 369 F.3d 659, 676-77 (2d Cir. 2004) (noting *Miranda*'s "safeguards become applicable as soon as a suspect's freedom of action is curtailed to a

15

degree associated with formal arrest," and concluding suspect in custody when handcuffed, since handcuffs are "a hallmark of a formal arrest") (internal citations and quotation marks omitted). Correspondingly, because law enforcement failed to provide Ms. Anderson with *Miranda* warnings prior to interrogating her, the statements she made thereafter were made without a valid *Miranda* waiver. *See J.D.B.*, 131 S. Ct. at 2401 ("[I]f a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a prerequisite to the statement's admissibility as evidence in the Government's case in chief, that the defendant voluntarily, knowingly and intelligently waived his [or her] rights.") (internal quotations marks and alterations omitted); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986) (requiring that "relinquishment of [*Miranda* rights] must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception").

Ms. Anderson's statements were further tainted by coercive police conduct which included misrepresentations that her husband had incriminated her in drug trafficking during the traffic stop and by police misrepresentations that she would be transported to a hospital where the drugs would be extracted from her body if she did not remove them herself. *See Lynumn v. Illinois*, 372 U.S. 528, 534-35 (1963) (concluding repeated misrepresentations by police that suspect would be deprived of financial aid for dependent child rendered subsequent confession involuntary); *Spano v. New York*, 360 U.S. 315, 322-23 (1959) (ruling misrepresentation by suspect's friend that friend would lose his job as a police officer if the suspect failed to cooperate rendered his statement involuntary). She repeatedly invoked her right to see a signed search warrant before the trip to the hospital occurred. In response, law enforcement ignored her requests and sought to deceive her into believing the warrant had been granted by showing her an unsigned warrant application. In doing so, they repeatedly undermined her attempt to secure the rights afforded to her by the Constitution. These tactics "offend the community's sense of fair play and decency." *Rochin*, 342 U.S. at 173.

Ms. Anderson made incriminating statements only after she had "broken down" and began to whimper and cry. Her confession was thus clearly involuntary. *See*

16

*Yarborough v. Alvarado*, 541 U.S. 652, 667-68 (2004) ("[V]oluntariness of a statement is often said to depend on whether the defendant's will was overborne[.]") (internal quotation marks omitted).  The government concedes that Ms. Anderson's statements should not be admitted as evidence against Defendant.  It maintains, however, that the physical evidence obtained by the same methods should remain fully admissible.

"[M]ethods offensive when used against an accused do not magically become any less so when exerted against a witness."  *LaFrance v. Bohlinger*, 499 F.2d 29, 34 (1st Cir. 1974); *see also Gov't of Virgin Islands v. Georges*, 265 F.3d 1055 (3d Cir. 2001) (affirming *Georges v. Gov't of Virgin Islands*, 119 F. Supp. 2d 514, 522 (D.V.I. App. Div. 2000), which noted "evidence seized by investigative techniques so shocking that they violate the 'universal sense of justice' may be suppressed" and finding defendants had standing to raise the alleged police mistreatment of codefendant); *United States v. Richardson*, 1 F. Supp. 2d 495, 497-98 (D.V.I. 1998) ("In some cases, . . . a defendant may have standing to claim violation of his own Fifth Amendment right to due process if the police misconduct directed at a codefendant was so shocking and intentional that its introduction could deny the defendant a fair trial.").

Here, the evidence the government seeks to use at trial was obtained by an array of constitutional violations.  Ms. Anderson's unlawful detention, alone, tainted her ultimate decision to remove the drugs herself.  As the Second Circuit recently held, "[w]hen consent to search is preceded by an unlawful government seizure, the evidence obtained from the search must ordinarily be suppressed unless the Government shows both that the consent was voluntary *and* that the taint of the initial [seizure] has been dissipated." *United States v. Murphy*, 703 F.3d 182, 190 (2d Cir. 2012) (internal quotation marks omitted).  "[F]our factors [are] relevant to the analysis: (1) whether *Miranda* warnings were given, (2) the temporal proximity of the prior illegal act to the consent, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." *Id.* (internal quotations marks omitted).  In this case, each of those factors overwhelmingly supports a conclusion that Ms. Anderson did not voluntarily consent to extract the drugs from her body.

17

The government cites no compelling government interest or exigency which motivated law enforcement to engage in the practices at issue. *See McLaurin*, 2013 WL at 5477619, at *3. There was plenty of time and numerous opportunities for the law enforcement officers to pause, consider their course of conduct, and evaluate their options. They were not engaged in hot pursuit or alone on a deserted highway making split second decisions regarding how to proceed without knowing whether the person they were confronting was armed or otherwise dangerous. To the contrary, all of these activities took place in the confines of a state police barracks with access to more experienced officers and with guidance provided by a state court judge which the officers apparently rejected. *See Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013) (explaining that "the importance of requiring authorization by a neutral and detached magistrate before allowing a law enforcement officer to invade another's body in search of evidence of guilt is indisputable and great") (internal citations and quotation marks omitted).

Although the law enforcement officers were obviously eager to obtain evidence of a crime, this motivation presumably exists in every police investigation. Ms. Anderson was not a known trafficker of drugs which law enforcement had finally seized as the culmination of a lengthy and resource intensive investigation. She was, instead, a "suspicious" passenger in a "suspicious" vehicle which had been stopped for a traffic violation. The other occupants of the vehicle, including her husband who had a serious criminal record and who had claimed ownership of a bag that contained the vestiges of cocaine he has recently consumed, were allowed to proceed on their way.

Moreover, the law enforcement officers' activities in this case were not narrowly tailored to the objective they sought to achieve. *See McLaurin*, 2013 WL at 5477619, at *3. After the warrant application was denied, they could have presented Ms. Anderson with the option to cooperate with them by extracting the suspected drugs voluntarily, and they could have offered her leniency in the event she did so. They did not attempt to gain her cooperation in this lawful manner.

Finally, the police conduct at issue here is egregious and does "more than offend some fastidious squeamishness or private sentimentalism about combatting crime too

18

energetically." *Rochin*, 342 U.S. at 172.  It violates "those fundamental rights and liberties . . . implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 720-21. (internal citations and quotation marks omitted).  It strikes at the very heart of the Constitution's warrant requirement.  Indeed, there would be little, if any, incentive to ever obtain an actual search warrant if law enforcement could merely pretend that one exists and thereby bypass the time-consuming and cumbersome process of obtaining one. The court has found no authority that would allow a law enforcement ruse to go that far. Accordingly, what distinguishes this case from many others is the prolonged and coercive use of police deception regarding the existence of a search warrant, even after law enforcement officers knew that a judge had denied their search warrant application and had determined that they lacked probable cause to proceed further with their efforts to obtain evidence of a crime from the most intimate location in Ms. Anderson's body. These facts mandate that evidence derived in this manner be inadmissible for any purpose.

In reaching a narrow conclusion based upon the unique facts presented here, the court is mindful of the Supreme Court's reluctance "to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Glucksberg*, 521 U.S. at 720 (internal quotation marks omitted). However, courts must also be "careful not to minimize the important and fundamental nature of the individual's right to liberty," *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (internal quotation marks omitted), and the Constitution's "assur[ance] . . . that no man is to be convicted on unconstitutional evidence." *Mapp v. Ohio*, 367 U.S. 643, 657 (1961). A contrary conclusion would endorse an abuse of police power fundamentally at odds with our system of criminal justice, violate the principle that "convictions cannot be brought about by methods that offend 'a sense of justice,'" *Rochin*, 342 U.S. at 173 (quoting *Brown v. Mississippi*, 297 U.S. 278, 285-86 (1936)), and tacitly approve of law enforcement's use of deceptive and coercive practices that violate the Constitution and that are rife with the potential for further and even more egregious abuse.

The Due Process Clause "gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice." *Mapp*, 367 U.S. at 660. Here, it requires suppression of the physical evidence obtained without valid consent from Crystal Anderson's body.

<b>CONCLUSION</b>

For the foregoing reasons, the court hereby GRANTS IN PART and DENIES IN PART Defendant's Motion to Join in Crystal Anderson's motion to suppress evidence and hereby ORDERS suppression of the physical evidence obtained from Crystal Anderson's vaginal cavity on October 31, 2012. (Doc. 30.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 24 day of October, 2013.

Christina Reiss, Chief Judge
United States District Court